DISTRICT COURT - N.D. OF N.Y.
**FILED**
AUG 20 2021
AT_____ O'CLOCK_____
John M. Domurad, Clerk - Albany

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA
ex rel.
ALEXANDRA POOLE,

*1:* 21 CV *943 ( MAD| ATB )*

Plaintiff,

QUI TAM COMPLAINT

-against-

DEMAND FOR JURY TRIAL

THE RENSSELAERVILLE INSTITUTE,
INC., and RODNEY M. FULLER,
individually,

Filed under seal pursuant to
31 U.S.C. § 3730(b)(2)

Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

1.     This is a civil action by relator ALEXANDRA POOLE ("Relator") on Relator's own behalf and on behalf of the United States of America ("United States") against THE RENSSELAERVILLE INSTITUTE, INC., ("TRI") and RODNEY M. FULLER ("FULLER"), individually, (jointly, the "Defendants"), under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA"), for treble damages, per claim/per false statement penalties, reasonable attorneys' fees, litigation expenses and costs, and other relief, arising from Defendants' fraudulent application for, and receipt of, Paycheck Protection Program ("PPP") funds, directly or indirectly, from the United States Small Business Administration ("SBA"), during 2020,  through a false and fraudulent loan application and other information submitted to a PPP-participating lender transacting business in this District. (The "Qui Tam Claims.") Relator also includes a whistleblower retaliation claim in this action on Relator's own behalf against TRI under § 3730(h)

1

of the FCA, seeking actual and consequential damages reasonable attorneys' fees, litigation expenses and costs, and other relief, arising from TRI's wrongful termination of Relator's employment for engaging in protected whistleblower activities. (The "Retaliation Claim.")

## OVERVIEW OF THE ACTION

2.      As set forth more fully below in this complaint, Defendants violated the false claims liability provisions of the FCA by applying for and receiving PPP funds on behalf of TRI in the amount of $500,000, to which TRI was not entitled, either in full, or in the specific amounts sought and obtained, and by wrongfully retaining such funds, all in violation of 31 U.S.C. §§ 3729 (a)(1)(A), (B) and (G).

3.      More specifically, on or about April 13, 2020, Defendants knowingly submitted an SBA PPP Borrower Application Form ("Form 2483") or the equivalent, to SBA-authorized lender The Bank of Greene County, containing materially false and fraudulent statements and representations concerning the Defendant's "Average Monthly Payroll," "Number of Employees" and/or promise to use the PPP funds "to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule" (the "Covered Costs") during the 24-week period following receipt of the loan proceeds as part of an application for a $500,000 PPP loan.

4.      On or about April 28, 2020, the Bank approved Defendants' PPP loan application and, and TRI received $500,000 in PPP funds on or about May 8, 2020.

5.      As a result of the above-described activities, the United States suffered significant economic losses, the precise amount of which will be determined at trial.

6.      Additionally, TRI wrongfully terminated Relator's employment on or about September 11, 2020, after Relator raised issues with and objections to, and tried to prevent, Defendants' submission of a false and fraudulent PPP application on behalf of TRI.

7.      Relator has suffered economic losses and other damages and injuries as a result of Relator's wrongful termination, in an amount to be determined at trial.

## JURISDICTION

8.      The Court has subject matter jurisdiction over the federal claims alleged in this complaint under 31 U.S.C. § 3732(a) (False Claims Act), 28 U.S.C. § 1331 (federal question), and § 1345 (United States as plaintiff, should it choose to intervene in the action).

9.      The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) because Defendants can be found, reside, and transact business in this District, and because an act proscribed by 31 U.S.C. § 3729 occurred within this District. Section 3732(a) further provides for nationwide service of process.

## VENUE

10.      Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), and 31 U.S.C. § 3732(a) in that Defendants reside and transact business, and a substantial part of the events or omissions giving rise to the violations of 31 U.S.C. § 3729 alleged in this complaint occurred in this District.

3

## PARTIES, ENTITIES, AND INDIVIDUALS

11.    The United States, through the SBA is the real party in interest in the *Qui Tam* Claims in this action.

12.    The SBA is located at 409 Third Street, SW, Washington, D.C. 20416. It was created in 1953 as an independent agency of the United States government ("Government") to aid, counsel, assist and protect the interests of small business concerns, to preserve free competitive enterprise and to maintain and strengthen the overall U.S. economy. Among other things, the SBA assists small businesses in recovering from economic disasters, such as, the coronavirus pandemic that ravished the U.S. economy beginning in early 2020. One means the SBA uses in such circumstances is providing low-interest loans to qualified borrowers.

13.    The PPP is an example of the SBA providing a lifeline of emergency capital to small businesses suffering severe financial losses during a national economic crisis.

14.    From on or about in or about April, 2020, to in or about August, 2020, SBA-authorized lenders approved a total of approximately 5.2 million PPP loans to applicants nationwide for an aggregate of approximately $525 billion. Of these, approximately 660,000 applicants received between $150,000 and $10,000,000 million in PPP funds. The PPP loan program was subsequently extended for a 'second draw' for certain eligible borrowers.

15.    The SBA contracted with the numerous banks and other financial institutions to serve as loan processors, underwriters and lenders for borrowers of PPP funds during 2020. The Bank of Greene County (the "Bank") is an example of one of these lenders. The Bank's headquarters are located at 302 Main Street, Catskill, New York 12414.

4

16.     Relator is a resident of this District, and is the real party in interest in the Retaliation Claim in this action. From on or about January 7, 2018 to on or about September 11, 2020, Relator was the Chief Financial Officer ("CFO") of TRI.

17.     TRI is a New York not-for-profit corporation and an IRS tax-exempt entity under Internal Revenue Code, § 501(c)(3), whose stated mission is to "increase life chances for children through education and community." Https://www.rinstitute.org/. TRI is overseen by a board of trustees ("Board"), that, at times relevant to this action, included, M.K. Larson, Clyde E. "Skip" Rankin, III, Joseph F. Bruderek, Jr., Leon Haynes, III, Sabrina D. King, Antoinette D. Lucia, Bruce R. Mendelsohn, Geoffrey Platt, Thomas Ross and Joe Swimmer. TRI is located at 750 Delaware Avenue, Suite 3, Delmar, New York 12054-9747. TRI's EIN is 14-6027612. On or about April 13, 2020, TRI applied through the Bank for a PPP loan in the amount of $500,000 (SBA loan number 12611473-09), and, on or about May 8, 2020, received that amount from the Bank through a direct deposit to TRI's account at the Bank (account number 5201931880).

18.     Fuller resides in New Rochelle, New York. From on or about to in or about mid-May 2020, Fuller was President of TRI. Fuller executed and submitted or caused to be submitted TRI's PPP loan application in or about July or August 2019 and executed TRI's loan repayment note to the Bank on or about May 5, 2020.

## FALSE CLAIMS LIABILITY UNDER THE FCA

19.     The FCA imposes civil liability on "any person" who, among other things:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

5

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;…or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. §§ 3729(a)(1)(A), (B) and (G).

## DEFINITIONS IN THE FCA'S FALSE CLAIMS LIABILITY SECTION

20.    For purposes of the FCA, "knowing" and "knowingly" mean that a person, with respect to information: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.    31 U.S.C. § 3729(b)(1).

21.    For purposes of the FCA, "claim" means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(b)(2)(A) (as amended May 20, 2009; the prior version is materially identical for purposes of this action).

22.    For purposes of the FCA, "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee

6

relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

23.    For purposes of the FCA, "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

## FALSE CLAIMS DAMAGES AND PENALTIES AND QUI TAM AWARDS UNDER THE FCA

24.    The FCA imposes liability on any person violating Section 3729 to the United States as follows: a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104–410), plus three (3) times the amount of damages which the United States sustained because of the act of that person. 31 U.S.C. § 3729(a)(1).

25.    Where the Government proceeds with an action commenced by the filing of a *qui tam* complaint and recovers money from a defendant under Section 3729, the person who initiated the action (the "relator") may receive between fifteen percent (15%) and twenty-five percent (25%) of the proceeds.  Where the Government does not proceed with such an action and the relator pursues it on his/her own and recovers proceeds from a defendant under Section 3729, the relator may receive between twenty-five percent (25%) and thirty percent (30 %) of the proceeds.  In either case, the relator is also entitled to an award against the defendant for the amount of all reasonable expenses, attorneys' fees and costs. 31 U.S.C. § 3730(d).

7

## NONE OF THE FCA'S FALSE CLAIM AND QUI TAM BAR PROVISIONS IS APPLICABLE

26.    Upon information and belief, none of the bars set forth in the FCA's false claims and *qui tam*-related provisions, 31 U.S.C. §§ 3730(b)(5) and (e), is applicable to this action.

27.    Upon information and belief, no person other than the Government has brought a related action based on the facts underlying this complaint. 31 U.S.C. § 3730(b)(5).

28.    This action is not brought by a former or present member of the armed forces under 31 U.S.C. § 3730(b) against a member of the armed forces arising out of such person's service in the armed forces. 31 U.S.C. § 3730(e)(1).

29.    This action is not brought against a Member of Congress, a member of the judiciary, or a senior executive branch official. 31 U.S.C. § 3730(e)(2).

30.    Upon information and belief, this action is not based on allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party. 31 U.S.C. § 3730(e)(3).

31.    Upon information and belief, none of the allegations or transactions as alleged in this action or claim were publicly disclosed via the following channels: (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media. 31 U.S.C. § 3730(e)(4)(A).

32.    In addition to the foregoing allegation, Relator is an "original source," as defined in the FCA, 31 U.S.C. § 3730(e)(4)(B), because: (1) prior to a public disclosure under 31 U.S.C. §§ 3730(e)(4)(A)(i)-(iii), Relator voluntarily disclosed to representatives of the United States

Attorney's Office for the Northern District of New York the information on which the allegations or transactions in this complaint's claims are based; and/or (2) through employment as the CFO for TRI, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions, and Relator voluntarily provided the information to representatives of the United States Attorney's Office for the Northern District of New York before filing an action under the *qui tam* provisions of the FCA. 31 U.S.C. §§ 3730(e)(4)(B)(1) and (2).

## FCA'S ANTI-RETALIATION LIABILITY PROVISIONS

33.     The FCA protects whistleblowers from workplace retaliation, as follows:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of [Section 3729 of the FCA].

30 U.S.C. § 3730(h)(1).

## FCA'S ANTI-RETALIATION DAMAGES PROVISIONS

34.     Relief under § 3730(h)(1) includes:

> reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

30 U.S.C. § 3730(h)(2).

## FCA'S STATUTES OF LIMITATIONS

35.    A *qui tam* claim under section 3730(b) of the FCA may not be brought: (1) more than 6 years after the date on which the violation of section 3729 is committed; or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last. 31 U.S.C. § 3731(b).

36.    A retaliation claim under section 3730(h) of the FCA may not be brought may not be brought more than 3 years after the date when the retaliation occurred.  31 U.S.C. § 3730(h)(3).

## PAYCHECK PROTECTION PROGRAM

37.    Congress authorized the PPP in the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, P.L. 116-136, of March 2020. The program was intended to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic through forgivable loans to small businesses for job retention and other specified expenses. The two most favorable aspects of the loans were a low interest rate (namely, 1%) and the opportunity to have the loan completely forgiven if certain specified conditions were met.

38.    Congress originally authorized approximately $349 billion in PPP funds in March 2020. In April 2020, it authorized an addition approximate $300,000 billion.

39.    Between approximately April 3, 2020 and August 8, 2020, the SBA made approximately 5.2 million PPP loans in the United States.

10

40.     Because of the overwhelming need to get financial relief as quickly as possible to small businesses during the early stages of the coronavirus pandemic, the SBA did not implement close or stringent lending oversight to individual PPP loan applications requesting less than $2 million. It was almost an honor system among the applicants, the lenders and the SBA. The SBA's Office of Inspector General ("OIG") has since publicly acknowledged there was massive fraud in the applications for, and receipt of, PPP funds.

41.     PPP rules required the funds to be expended solely on the following "authorized purposes," also referred to as, "allowable uses" or "permissible expenses": payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities.

42.     PPP rules defined "payroll costs" to include wages, salaries, tips and commissions, as well as the following non-cash employment benefits: employer contributions to defined-benefit or defined-contribution retirement plans; payment for the provision of employee benefits consisting of group health care coverage, including, insurance premiums; payment of state and local taxes assessed on compensation of employees; and costs for employee vacation, parental, family, medical, and sick leave.

43.     However, the CARES Act excluded from the definition of payroll costs for PPP loan application purposes any employee compensation in excess of an annual salary of $100,000. PPP rules and regulations also precluded a borrower from including as payroll costs payments made to self-employed, independent contractors (so-called, "1099 Employees").

44.     To be a qualified borrower for PPP purposes, a small business (or non-profit organization) had to be in existence on February 15, 2020 and have employees for whom it paid salaries and payroll taxes, or paid independent contractors, as reported on IRS Forms 1099-MISC.

11

The borrower could be an independent contractor, eligible self-employed individual, sole proprietorship or an organization employing no more than 500 employees (with certain exceptions allowing a greater number).

45. To obtain PPP funding, the qualified borrower had to submit an SBA PPP loan application form ("Form 2483"), signed by an authorized representative of the entity, as well as certain backup supporting documentation.

46. Form 2483 required the borrower to specify, among other things, its: (a) "Average Monthly Payroll," and (b) "Number of Employees," both of which figures were defined by PPP rules.

47. Under PPP rules, the Average Monthly Payroll and Number of Employees figures were used these to set the maximum amount of funds the borrower was eligible to receive. That maximum was calculated as the borrower's Average Monthly Payroll multiplied by 2.5, with certain adjustments where the borrower had received an SBA Economic Injury Disaster Loan ("EIDL").

48. The average monthly payroll cost was derived by aggregating allowable payroll costs from the prior twelve months (with certain exceptions) for employees whose principal place of residence was the United States and subtracting compensation paid to any employee in excess of an annual salary of $100,000. That figure was then divided by twelve to arrive at the average monthly payroll cost. Regardless, of the borrower's actual calculated average monthly payroll, however, the maximum PPP for any single borrower loan could not exceed $10,000,000.

49.     Form 2483 also required the borrower to affirm, among other things, having read and understood Form 2483 and the borrower's eligibility to receive a PPP loan under the SBA rules in effect at the time the application was submitted.

50.     Form 2483 further required the borrower to certify as follows:

> I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

51.     PPP loans were processed by SBA-authorized participating lenders. The lenders received from prospective borrowers, among other things, the Form 2483 and certain supporting loan application documentation, such as, IRS and/or state revenue department forms showing periodic employment/unemployment tax information for the borrower, for example IRS Forms 940 (Employer's Annual Federal Unemployment ("FUTA") Tax Return), 941 (Employer's Quarterly Federal Tax Return), W-2 (Wage and Tax Statement) and W-3 (Transmittal of Wage and Tax Statements).

52.     Where the PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which the SBA guaranteed 100%.

53.     After PPP loans were approved, the lenders conveyed the borrower's information, including the amount of the loan and Form 2483-listed number of employees, to the SBA.

54.     Approved borrowers were also required by the terms of Form 2483 to provide to the lender with documentation verifying the number of full-time equivalent employees on the

borrower's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the 24-week period following receipt of the loan proceeds.

55.    The PPP rules as finally implemented further required, for loan forgiveness purposes, that the PPP funds to be expended for authorized purposes during the 24-week period following receipt of the loan proceeds and that at least 60% of the loan proceeds were used for covered payroll expenses.

56.    In addition to promulgating and publishing PPP rules and regulations, the SBA also disseminated to the general public, including via the Internet, PAYCHECK PROTECTION PROGRAM LOANS, Frequently Asked Questions (FAQs) with SBA-provided answers and other summaries and explanations of the program's requirements.

## FACTUAL ALLEGATIONS CONCERNING DEFENDANTS' FRAUDULENT APPLICATION FOR, AND RECEIPT AND RETENTION OF, PPP FUNDS

A. Background

57.    At all times relevant to this compliant, Defendants, lied to the Bank and SBA about TRI's average monthly payroll costs, number of employees and use of proceeds.

58.    On or about April 7, 2020, DEFENDANT FULLER contacted RELATOR about TRI's applying for a PPP loan.

59.    RELATOR informed DEFENDANT FULLER that she had looked into the program and had estimated, based upon TRI's payroll, that TRI would be eligible for a loan of

approximately $330,000. RELATOR also conveyed that she was opposed to TRI's seeking a PPP loan, based on the entity's traditionally conservative approach in financial matters.

60.    DEFENDANT FULLER, however, asserted that TRI was eligible for a PPP loan of $500,000. He did not provide any rationale for this calculation, which far exceeded the amount that RELATOR had estimated.

61.    RELATOR was concerned with DEFENDANT FULLER's stated intention to apply for a PPP loan in excess of what RELATOR had calculated to be the maximum eligibility amount. RELATOR therefore sent DEFENDANT FULLER an e-mail on April 8, 2020, copying another TRI employee. In the e-mail, she set out her calculation for a maximum PPP loan of $326,493.03. She also attached Excel spreadsheets with supporting payroll data and calculations. DEFENDANT FULLER acknowledged receipt by reply e-mail that day.

62.    In e-mail correspondence with DEFENDANT FULLER on April 16, 2020, RELATOR asked DEFENDANT FULLER if a PPP loan application had been submitted. She added, "I have also voiced my ethical concerns about our involvement." DEFENDANT FULLER confirmed that it had been submitted. RELATOR asked for a copy of the application for her file.

63.    RELATOR had contacted the then-Chair of TRI's Board, M.K. Larson, by e-mail on April 15, 2020 requesting a call with the Board "as soon as is reasonably possible: regarding "a number of concerns." In response, Larson scheduled a call among RELATOR, herself and Joseph Bruderek, Jr. then then-Chair of the Board's finance committee, in the late afternoon of April 16, 2020.

64.    On the April 16, 2020 call with Board members Larson and Bruderek (and later joined by another staff member), RELATOR expressed her concerns about her discussions with

DEFENDANT FULLER and his statement that he had caused TRI to apply for a PPP loan, as well as other concerns about DEFENDANT FULLER.

65.    In a follow-up e-mail on April 17, 2020 to Joseph Bruderek and another member of the Board's finance committee, Thomas Ross, RELATOR stated in part, "I have not received a copy of the PPP application. I am hopeful it was not actually submitted. . . . It would be better if we don't have a federal loan application floating out there for more money than we were entitled to."

66.    RELATOR also expressed her concerns about the proposed PPP loan in a call in late April 2020 with DEFENDANT FULLER and other senior personnel of TRI. DEFENDANT FULLER expressed anger at RELATOR for doing so, and she was compelled to apologize to him.

67.    On or about April 30, 2020, DEFENDANT FULLER announced that the Loan Application had been approved.

68.    On or about May 1, 2020, having learned of the approval of the Loan Application notwithstanding her stated concerns, RELATOR e-mailed a complaint to the Board setting forth her objections to the Loan Application, as well as other issues.

B.  The Fraudulent Loan Application

69.    Upon information and belief, Defendants presented false or fraudulent information to the Bank and the SBA as to covered payroll and other costs to disguise its intended misuse of PPP proceeds for unallowable uses.

70.    Upon information and belief, TRI, through its employees, and with DEFENDANT FULLER's assistance, knowingly and wrongfully retained the PPP proceeds it unlawfully received and to which it was not entitled.

16

71.     Upon information and belief, on or about April 15, 2020, DEFENDANT FULLER caused TRI to submit the materially false and misleading Loan Application in which DEFENDANTS knowingly and falsely stated, among other things, that TRI's monthly average payroll (which, as noted above, incorporated applicable PPP adjustments)for compensation in excess of $100,000, local taxes and costs of medical benefits) was $210,000, when in fact it was approximately $131,000.     In addition, DEFENDANTS knowingly requested a PPP loan of $500,000, which they knew was well in excess of the maximum loan to which they were entitled based upon accurate payroll figures, namely, a loan of approximately $350,000.

72.     Upon information and belief, on or about April 29, 2020, the Bank approved the Loan Application and issued a promissory note, which DEFENDANT FULLER signed for TRI, for the requested loan amount of $500,000.

73.     Notwithstanding RELATOR's expressed concerns about the amount of the PPP loan that TRI had obtained, upon information and belief TRI took no steps in the subsequent weeks to rescind the loan or to return any of the loan proceeds.  To the contrary, upon information and belief, TRI retained the entirety of the loan proceeds.

## TRI'SREFUSAL TO CORRECT THE FALSE LOAN APPLICATION AND VIOLATION OF THE FCA'S ANTI-RETALIATION PROVISIONS

74.     As explained above, RELATOR expressed her concerns about the Loan Application even before it was submitted.  She expressed these concerns to DEFENDANT FULLER and other TRI personnel, as well as members of TRI's Board.

75.    In or around mid-May 2020, TRI announced that DEFENDANT FULLER was resigning as President of TRI, and Mildred Toliver was appointed as interim President. In addition, M.K. Larson resigned as Board Chair, and Skip Rankin became interim Board Chair.

76.    As of the May 2020 personnel changes, TRI was in the midst of its annual audit.

77.    Over the course of the next several months, RELATOR continued to ask for details concerning the terms of the PPP loan, but she was provided none. These communications included, among others, e-mail communications with interim President Mildred Tolliver on or about July 6, August 3, 17 and 20, 2020 and with the TRI Board of Trustees on or about August 21, 2020.

78.    RELATOR also raised her concerns with TRI's auditors. On a call on or about September 2, 2020 among two representatives of TRI's outside auditing firm, and at least interim President Mildred Tolliver, Tom Ross and RELATOR for TRI the auditors pressed for additional information concerning the PPP loan.

79.    In addition, RELATOR had also raised her concerns with the Bank of Greene County.

80.    On or about September 11, 2020, interim President Mildred Toliver informed RELATOR that she was being terminated immediately.

81.    While Ms. Toliver told RELATOR that the reason for her termination was budgetary, this was a pre-text. In the summer of 2020, TRI had laid off two administrative personnel whom DEFENDANT FULLER had hired. Unlike with RELATOR, however, TRI paid severance compensation to each of these persons, even though they each worked at TRI for a shorter period than did RELATOR. Moreover, TRI subsequently re-hired one of these people.

18

82.     In fact, TRI terminated RELATOR in direct retaliation for raising her opposition to the false and fraudulent the Loan Application and TRI's subsequent receipt and retention of the loan proceeds.

83.     Upon information and belief, TRI applied for a 'second draw' PPP loan in January or February 2021, in the amount of $344,000.  On or about February 29, 2021, the 'second draw' loan application was approved in the requested amount under SBA Loan Number 1606108507.

**COUNT 1**
**False Claims Act Violations Against Defendants**
**31 U.S.C. §§ 3729(a)(1)(A), (B), and (G)**

84.     Relator realleges the above allegations as if set forth fully here.

85.     This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729-32.

86.     Through the acts described above and otherwise, Defendants, by and through their employees, agents and representatives, knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth:

(a)     Presented, or caused to be presented, to an SBA-authorized PPP lender and to an officer or employee of the SBA, false or fraudulent claims for payment or approval concerning PPP loan applications by misstating on Forms 2483 the Defendants' Average Monthly Payroll and Number of Employees, as well as, promises not to misuse PPP proceeds while, in fact, using them for purposes other than those allowed by the PPP rules and regulations, all in violation of 31 U.S.C. § 3729(a)(1)(A);

(b)     Used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, namely, by submitting the above-described Forms 2483 and supporting loan

19

documentation to an SBA-authorized PPP lender and to the SBA,  all in violation of 31 U.S.C. § 3729(a)(1)(B). And,

    (c)    Made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government by wrongfully retaining PPP funds to which each Defendant was not entitled, all in violation of 31 U.S.C. § 3729(a)(1)(G).

87.    Upon information and belief, prior to receiving notice of Relator's allegations, the United States was unaware of the falsity and fraudulent nature of the PPP loan-related claims, records or statements submitted or made by each of the Defendants to the lenders and/or SBA.

88.    Upon information and belief, the false and fraudulent PPP loan-related claims, records or representations made to the lenders and/or the SBA by each Defendant were material to the SBA's decisions to make PPP funds available to Defendants.

89.    By reason of each Defendants' violations of the FCA, the United States has suffered a substantial economic harm in an amount to be determined at trial and is entitled to treble damages and a civil penalty as required by law for each violation.

## COUNT 2
### False Claims Act Violation Against TRI
### 31 U.S.C. § 3730(h)

90.    Relator realleges the above allegations as if set forth fully here.

91.    This is a claim for actual and consequential damages under the FCA, 31 U.S.C. § 3730(h).

92.     By objecting to and seeking to prevent TRI from fraudulently applying for, receiving and retaining PPP loan funds, Relator was engaged in protected activity, as provided by 31 U.S.C. § 3730(h)(1).

93.     TRI knew Relator was engaged in protected activity under the FCA.

94.     TRI terminated Relator's employment because of Relator's engagement in protected activity under the FCA.

95.     By reason of TRI's wrongful discrimination in terms and conditions of employment, Relator suffered substantial economic harm in an amount to be determined at trial and is entitled to reinstatement, damages and other relief, as provided by 31 U.S.C. § 3730(h)(2).

## DEMAND FOR RELIEF

WHEREFOR, Relator, on behalf and in the name of the United States, and on Relator's own behalf under the *qui tam* provisions of the FCA, demands judgment against Defendants as follows:

A.     As to Count 1 of the complaint:

(i)     Directing Defendants to cease and desist from violating the FCA;

(ii)    Awarding damages in the amount of three times the economic loss the United States sustained because of Defendants' actions, plus a civil penalty of $11,000 for each act in violation of the FCA, as provided by 31 U.S.C. § 3729(a) and adjusted by subsequent legislation, with interest;

(iii)   Directing Relator be awarded the maximum amount available under 31 U.S.C. § 3730(d) for bringing this action, namely, twenty-five percent (25%) of the proceeds

of the action or settlement of the claim if the United States intervenes in the matter (or pursues its claim through any alternate remedy available to the United States, 31 U.S.C. § 3730(c)(5)), or, alternatively, thirty percent (30%) of the proceeds of the action or settlement of the claim, if the United States declines to intervene;

(iv)    Awarding Relator all reasonable litigation expenses necessarily incurred in prosecution these claims, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d). And.

B.    As to Count 2 of the complaint:.

(i)    Reinstating Relator to Relator's former position, with seniority;

(ii)    Awarding Relator all actual and consequential damages to which Relator is entitled, including, but not limited to, two times the amount of back pay, interest on the back pay, and compensation for any special damages;

(iii)    Awarding Relator all reasonable litigation expenses necessarily incurred in prosecution this claim, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(h). And,

C.    Granting such other and further relief to the United States and Relator as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Relator hereby demands this case be tried before a jury.

Dated: Albany, New York
      August 17, 2021

/s/ Timothy J. McInnis

By: _____

Timothy J. McInnis
McInnis Law
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tel :( 212) 292-4573
Fax: (212) 292-4574
Email: tmcinnis@mcinnis-law.com

Thomas R. Fallati, Esq.
Tabner Ryan and Keniry LLP
18 Corporate Woods Boulevard,
Albany, NY 12211
Tel. (518) 512-5307
Fax (518) 465-5112
trf@trklaw.com

23